IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CR-22-WKW |
| | ) | [WO] |
| JIMMY ALLEN MONK | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER[1]

Defendant Jimmy Allen Monk objected to the presentence investigation report ("PSR"). Mr. Monk challenged the loss calculations that led to the twelve-level enhancement in his base offense level under § 2B1.1(b) of the United States Sentencing Guidelines. He also objected to the restitution amount. On May 27, 2020, Mr. Monk's sentencing hearing commenced with testimony and evidence introduced on Mr. Monk's objections. The sentencing hearing resumed on July 29, 2020. For the reasons that follow, Mr. Monk's objections to the loss amount under § 2B1.1(b) and for restitution are sustained as to the loans to Real Island Investments, LLC. The other objections to the restitution amount initially were deferred until the later hearing on restitution; however, they were resolved by the parties during the July 29 hearing.

---

[1] This opinion amends the Memorandum Opinion and Order (Doc. # 34) relating to a Memorandum of Understanding that was erroneously referred to during the May 27 hearing as a "cease-and-desist" order. This opinion also incorporates intervening factual developments.

# I. BACKGROUND

## A.  <u>Introduction</u>

On February 7, 2020, Defendant Jimmy Allen Monk, former president of PrimeSouth Bank's Wetumpka branch, was charged in a felony information with one count of bank fraud in violation of 18 U.S.C. § 1344(2).  To obtain a conviction under § 1344(2), "the government must prove beyond a reasonable doubt that (1) a scheme existed to obtain money or property in the custody of a federally insured financial institution by fraud; (2) [Mr. Monk] participated in the scheme by means of material false pretenses, representations, or promises; and (3) [Mr. Monk] acted knowingly."  *United States v. Martin*, 803 F.3d 581, 588 (11th Cir. 2015).  Section 1344(2) does not require proof that the defendant "intended to defraud a bank."  *Loughrin v. United States*, 573 U.S. 351, 353 (2014).

On February 20, 2020, Mr. Monk pleaded guilty to the information.  The scheme underlying Mr. Monk's conviction involved his taking an unauthorized advance from a PrimeSouth loan and applying the proceeds of the advance to a different PrimeSouth loan that was past due, to bring it current.  Specifically, Mr. Monk admitted that, on June 30, 2015, he executed an unauthorized advance of $22,800 from a PrimeSouth loan of the Elmore County Economic Development Authority ("ECEDA") and applied the proceeds of that advance as payments on two unrelated loans that were past due.  (Plea Agreement, at 6 (Doc. # 10); PSR ¶ 7;

Information (Doc. # 1).)  To disguise the source of the funds, Mr. Monk used a third-party law firm, Reneau & Thornton Attorneys at Law.  Mr. Monk issued a cashier's check in the amount of the loan ($22,800) to the law firm, with instructions for it to issue two checks from its escrow account to PrimeSouth in the amounts of $20,000, and $2,800.  (PSR ¶¶ 6–7.)

## B.   **Mr. Monk's Objections to the Presentence Investigation Report**

In preparation for sentencing, the probation officer prepared a PSR.  The PSR set forth loans and advances, which it contends are "associated with [Mr. Monk's] scheme."  (PSR ¶ 15.)  The PSR recommended a twelve-level increase to Mr. Monk's base offense level based upon its calculation of an "actual loss" totaling $438,316.65.  *See* U.S.S.G. § 2B1.1(b)(1)(G) (designating a twelve-level increase for losses more than $250,000 but not exceeding $550,000); (PSR ¶ 15.)  Mr. Monk objected to the following loss amounts:

| Loan Amount | Originating Loan Account | Benefitting Account |
|---|---|---|
| $188,518.75[2] | Real Island Investments, LLC (William Fuller as personal guarantor) | William Fuller (2008 non-performing loan) |

---

[2] There were two errors in the original PSR's chart concerning the loans to Real Island Investments, LLC.  First, the PSR listed the first loan amount as $188,5*81*.75.  (*See* PSR ¶ 15 (chart) (emphasis added).)  Second, the entries in the first two rows addressing the Real Island Investments, LLC loans stated that the loan amounts were "drawn from" William Fuller and "paid to" the defaulted Real Island Investments loans.  That was incorrect.  The loan amounts were drawn from Real Island Investments (in 2013) and paid on William Fuller's 2008 loans. The PSR has been amended to correct these errors.

3

| $64,569.52 | Real Island Investments, LLC (William Fuller as personal guarantor) | William Fuller (2008 non-performing loan) |
| **Unauthorized Advances (disputed portions)** | **Originating Loan Account** | **Benefitting Account** |
| $1,237.00 | ECEDA | ECEDA Building Loan |
| $   828.15 | ECEDA | ECEDA Building Loan |

A deduction of the disputed loss amounts would reduce the total loss to $183,162.45, with a corresponding ten-level increase in Mr. Monk's base offense level. *See* § 2B1.1(b)(1)(F) (assigning a ten-level increase in the offense level for losses more than $150,000 but not exceeding $250.000). Weighted against Mr. Monk's criminal history category of I, the difference in the guidelines ranges is 27 months to 33 months (PSR) or 21 months to 27 months (Mr. Monk).

Because the two disputed loss amounts concerning the unauthorized advances from the ECEDA loans have no effect on the § 2B1.1(b) loss calculation and resulting guidelines range, the court need not decide whether those amounts should be included in the loss calculations.

### D.    <u>Evidentiary Findings</u>

Because Mr. Monk objects to the loss amount under § 2B1.1(b)(1), the Government bears the burden of proving the loss attributable to Mr. Monk by a preponderance of the evidence "using reliable and specific evidence." *United States v. Annamalai*, 939 F.3d 1216, 1235 (11th Cir. 2019) (citation and internal quotation marks omitted). At the sentencing hearing on May 27, 2020, the Government sought

to prove that the loss was $438,316.65, consistent with the PSR's calculation.  The Government relied upon bank records and the testimony of an agent with the Federal Bureau of Investigation ("FBI").  Mr. Monk also testified and introduced exhibits. The credible evidence, which follows, does not sustain the Government's burden of proof.

Mr. Monk's employment at PrimeSouth spanned from 2004 to 2019.  (Tr. at 88 (Doc. # 33).)  By 2009, Mr. Monk had become branch president and a member of the Board of Directors; unfortunately, he amassed a history of unwise lending practices resulting in excessive past-due loans.  As a result, in 2009, PrimeSouth stripped President Monk of his lending authority.  (Tr. at 90–91, 103.)  Two of the non-performing (and unsecured) loans in Mr. Monk's portfolio — originating in 2008 in the principal amounts of $175,000 and $59,939.21 — belonged to a long-time bank customer and attorney, William Fuller ("Fuller").  Another relevant event during this time frame is that in 2009 — following the real estate crash of 2008 — the condition of the Bank had deteriorated to the point that it entered into a Memorandum of Understanding with the FDIC and the Alabama State Banking Department (the "MOU") to correct structural and performance issues at the Bank.[3] (Doc. # 43-1 (MOU).)

---

[3] At the sentencing hearing on May 27, 2020, the parties referred to the MOU as a "cease-and-desist order."  Oddly, it was not introduced into evidence, and no one seemed to have a copy

At the heart of the parties' dispute concerning the PSR's calculation of loss are two unsecured loans PrimeSouth made in 2013 to a shell corporation, Real Island Investments, LLC ("Real Island Investments").   These loans were personally guaranteed by Mr. Fuller.  The undisputed purpose of these two loans was to funnel the proceeds back to PrimeSouth to pay off Mr. Fuller's 2008 non-performing loans and at a later date to charge off the Real Island Investments loans.  Importantly, the Government did not charge Mr. Monk with bank fraud in issuing the two loans to Mr. Fuller in 2008.  Rather, the Government contends that Mr. Monk's subsequent involvement in *uncharged conduct* — to conceal and delay the reportable losses on those loans — was unlawful.  Thus, the only theory to hold Mr. Monk accountable for the losses attributable to the non-performing 2008 Fuller loans is relevant conduct.  *See* U.S.S.G. § 1B1.3.

According to the record, this is how the conceal-and-delay plan went down. Mr. Monk's unrefuted testimony is that in December 2010 he, along with PrimeSouth's chief executive officer (David Baggett) and senior lender (Klay Peters), met in the Wetumpka office of PrimeSouth.  During that meeting, and operating under the pressure of the MOU, the three officers identified Mr. Fuller's two 2008 loans, among others, as non-performing and as potential losses for

---

of it, and for good reason:  It did not exist.  Nevertheless, the testimony jibed with the MOU sufficiently to confirm that the MOU and the "cease and desist order" were one and the same.

PrimeSouth.  A document, which was handwritten by Mr. Peters, lists the loans that were discussed during that meeting.[4]  (*See* Def.'s Ex. 5.)  During that meeting, a decision was made to extend the charge off of Mr. Fuller's two 2008 loans for a three-year period.  (Tr. at 96–97.)

There is a gap in the evidence between December 2010 and April 2013.[5]  What occurred in April 2013 largely is not in dispute.  Mr. Monk participated in a bank plan to pay off Mr. Fuller's defaulted 2008 loans.  (PSR ¶ 12; Tr. at 89.)  This plan had the effect of delaying the reporting of the losses on the 2008 Fuller loans, which would permit PrimeSouth "to time out losses" and "buy more time so that [its] income would cover the losses."  (Tr. at 101.)

To this end, at Mr. Monk's request, Mr. Fuller created Real Island Investments, a limited liability company with no assets or business.  (PSR ¶ 12; *see also* Tr. at 64–65.)  On April 29, 2013, Mr. Fuller, again at Mr. Monk's direction, obtained two unsecured loans from PrimeSouth for Real Island Investments based upon Mr. Fuller's personal guarantees.  The loans amounts were for $188,518.75

---

[4] Over the Government's objection, the court admitted Defendant's Exhibit 5, which Mr. Monk testified is a handwritten list of the loans Mr. Baggett, Mr. Peters, and Mr. Monk discussed during the December 2010 meeting.  Mr. Monk testified that the handwriting is that of Mr. Peters.  (Tr. at 95–98.)

[5] Mr. Monk did testify that during this time frame, there were "other meetings" among Mr. Baggett, Mr. Peters, and Mr. Monk concerning the writing off and discharging of the 2008 Fuller loans.  But no testimony was elicited concerning the details of those discussions or how many meetings were held.  (Tr. at 98.)

and $64,569.52 (which were the exact amounts owing on the non-performing 2008 Fuller loans).  Notably, notwithstanding that the old loans also were secured only by Mr. Fuller's personal guarantees, someone at the Bank — not Mr. Monk[6] — approved the new loans *with the very same security: the apparently worthless signature of Mr. Fuller with the proceeds of the new loans to a new entity*.  After the loans were obtained, Mr. Monk "washed" the loan proceeds through the third-party law firm.  The proceeds of the two Real Island Investments loans were used to pay off Mr. Fuller's 2008 past-due loans.  (*See* PSR ¶¶ 12, 13.)  The Real Island Investments loans were charged off in June 2015.  (Tr. at 100–01; Gov't Ex. 1a, at 2; Gov't Ex. 1c, at 2.)

At the sentencing hearing, Mr. Monk admitted that, at the time, he knew that the purpose of the two PrimeSouth loans to Real Island Investments was to roll over the losses created by the 2008 Fuller loans (thus, artificially inflating PrimeSouth's capital during that period by delaying the reporting of the loss).  He also knew that the 2013 loans would not be repaid.  (Tr. at 105–06; PSR ¶¶ 12–13.)

Mr. Monk does not dispute the part he played in the plan to conceal the losses on the 2008 Fuller loans and delay the reporting of those losses.  (Tr. at 107.)  But

---

[6] Pursuant to the 2009 MOU's requirement that, "within 30 days, the Board shall perform a review of each existing officer's performances, abilities, and assignments to position within the Bank," (Doc. # 45-1, at 7), Mr. Monk's lending authority was rescinded completely, though he remained on as President of the Wetumpka Branch.  His loan authority was never restored.

he contends that he acted with the authority of PrimeSouth and was not the only Bank official involved.[7]  Indeed, the evidence is that Mr. Monk executed someone else's plan; he did not have loan authority to approve the new loans to Mr. Fuller, nor did he have authority to write them off later.  (Tr. at 100-01.)

Mr. Monk testified that, because after 2009 he no longer had lending authority, he had to obtain loan approval through Joel Hunt (another senior loan officer).  If the loan exceeded Mr. Hunt's lending authority, however, Mr. Monk had to obtain the senior lender's or CEO's approval.  (Tr. at 94–95, 99.)  He testified that, under PrimeSouth policy, the CEO and senior lender had authority to approve unsecured loans up to $250,000, but that unsecured loans over $250,000 required the approval of a loan committee.[8]  (Tr. at 93–94.)  Specifically, as to the Real Island Investments loans, which exceeded even Mr. Hunt's loan authority, either the senior lender or the CEO would have had to approve those loans.  (Tr. at 99.)

Significantly, Mr. Monk testified that the Bank's credit approval request ("CAR") form — which was prepared for every new loan at PrimeSouth and was the first document in any loan file — would have identified the bank official who approved each of the two 2013 loans to Real Island Investments.  (Tr. at 92.)  That

---

[7] Mr. Monk is the only individual charged with bank fraud.  Mr. Fuller was not charged. The third-party law firm was not charged.  Neither PrimeSouth's CEO nor its senior lender was charged.

[8] A loan secured only by the personal guarantee of a creditor *already in default* can only be described as "unsecured."

bank official, according to Mr. Monk, would have been the CEO.  (Tr. at 99.)  But it is undisputed that the Government did not receive any CAR forms in discovery from PrimeSouth during its investigation.  (Tr. at 51.)  The reason PrimeSouth did not retain or turn over the CAR forms is something neither the Government nor Mr. Monk was able to explain.  (Tr. at 68–69.)

Mr. Monk also testified that, at least by December 2010, both the CEO and senior lender knew that the 2008 Fuller loans were "bad" loans that "would be charged off."  (Tr. at 97.)  Mr. Monk's testimony and defense exhibit 5, in conjunction with the loans' transaction history, demonstrate that the CEO and senior lender knew by December 2010 that Mr. Fuller was not going to repay the two 2008 loans.  They also both knew that the purpose of the Real Island Investments loans was to pay off the 2008 Fuller loans to extend the time frame for writing off the losses, and that Real Island Investments had no ability to repay the loans.  (Tr. at 99–100.)  Mr. Monk confirmed that the CEO "authorized the [2008] Fuller loans to be handled the way [in which] they were handled in 2013 with this LLC."  (Tr. at 101.)

Mr. Monk also testified that he did not have authority to charge off the Real Island Investments loans.  The senior lender would have had to recommend to the bank board that PrimeSouth charge off the loans.  (Tr. at 100–01.)

The Government did not present contrary evidence through its FBI case agent (who admitted on cross examination that she did not know the difference in a loan

application and a promissory note: "I've never seen a promissory note." (Tr. at 70, 72)). The senior lender at PrimeSouth was not interviewed during the FBI investigation of Mr. Monk. (Tr. at 65.) Nor was the CEO questioned about the 2008 Fuller loans or the Real Island Investments loans. (Tr. at 83.) The FBI did not obtain or review a copy of the MOU, and it is, thus, not part of the sentencing record. (Tr. at 72, 82.) The FBI did not know who at PrimeSouth approved the Real Island Investments loans. (Tr. at 50.) The Government did not have or review the quarterly filings required by the FDIC that showed the limits of PrimeSouth's authority to lend money and who within the Bank had that authority and how much.[9] (Tr. at 68; *see also* Tr. at 90.)

## II.  DISCUSSION

The discussion proceeds in three parts. Part A sustains Mr. Monk's objection to the PSR's actual loss attributed to him under § 2B1.1. Part B addresses restitution, and Part C overrules the Government's objection to the relevance of the MOU.

### A.  <u>Actual Loss Under § 2B1.1</u>

Three issues inform the determination of actual loss under § 2B1.1. These issues are: (1) whether Mr. Monk's involvement in the transactions concerning the payoffs of the 2008 non-performing Fuller loans with proceeds of the 2013 Real

---

[9] To be fair, the FBI white collar agent and the Assistant U.S. Attorney were both assigned to the case late in the investigation: the FBI agent, in 2017 or 2018, and the AUSA just weeks before the hearing.

Island Investments loans and in the subsequent charge off of the Real Island Investments loans is relevant conduct within the meaning of § 1B1.3, for purposes of calculating PrimeSouth's actual loss; (2) if those transactions are relevant conduct, whether the charge off of the Real Island Investments loans resulted in an actual loss to PrimeSouth of $253,088.27 where the evidence established that the lawful 2008 Fuller loans were the foundation for the initial loss; and (3) what credits, if any, should be applied against the loss amount calculated in the PSR.  Based on the credible evidence, each issue resolves in Mr. Monk's favor.

###   1.   Relevant Conduct

The parties give scant attention to the threshold issue of relevant conduct, but to properly calculate the Sentencing Guidelines, the court must address it.   In calculating loss, the sentencing court considers "all relevant conduct, not merely charged conduct." *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014) (citation and internal quotation marks omitted).  Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."  § 1B1.3(a)(2).  "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."  § 1B1.3 cmt. n.9(A). The sentencing court must "consider whether there are distinctive similarities

between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." *United States v. Siegelman*, 786 F.3d 1322, 1333 (11th Cir. 2015) (citation omitted).

Furthermore, although it does not appear that the Eleventh Circuit has yet ruled whether relevant conduct must be criminal conduct, every other circuit that has reached the issue has concluded that it must. *See United States v. Norris*, 452 F.3d 1275, 1282 n.1 (11th Cir. 2006) (citing decisions from the Third, Fourth, Fifth, and Seventh Circuits). "Although relevant conduct is not limited to conduct for which the defendant has been convicted, the conduct must amount to an offense for which a criminal defendant could potentially be incarcerated." *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013) (cleaned up). "In short, relevant conduct under § 1B1.3 must be criminal conduct." *Id.* (citing *United States v. Schaefer*, 291 F.3d 932, 940 (7th Cir. 2002)); *see also United States v. Griffith*, 584 F.3d 1004, 1013 (10th Cir. 2009) ("Agreeing with the reasoning of our sister circuits . . . , we hold that for a district court to consider a defendant's conduct as 'relevant' under the Sentencing Guidelines, the Government must prove by a preponderance of the evidence that the defendant (1) engaged in conduct (2) related to the offense of conviction pursuant to U.S.S.G. § 1B1.3 and (3) constituting a criminal offense under either a federal or a state statute."); *United States v. Schaefer*, 291 F.3d 932,

13

940 (7th Cir. 2002) ("Our holding that relevant conduct under § 1B1.3 of the Guidelines is limited to criminal conduct is amply supported by the case law in other circuits."). The reasoning of these courts of appeals is persuasive. *See, e.g., United States v. Peterson*, 101 F.3d 375, 385 (5th Cir. 1996) ("To hold otherwise would allow individuals to be punished by having their guideline range increased for activity which is not prohibited by law but merely morally distasteful or viewed as simply wrong by the sentencing court.").

Based on the foregoing principles, Mr. Monk's involvement in the Real Island Investments loans transactions is not relevant conduct under the Sentencing Guidelines unless the Government proves by a preponderance that Mr. Monk engaged in conduct that (1) is related to the offense of conviction pursuant to § 1B1.3 and (2) constitutes a criminal offense. The Government has proven neither.

First, the Government has not shown that Mr. Monk's involvement in the 2013 transactions involving the Real Island Investments loans is related to the offense of conviction. Mr. Monk pleaded guilty to a single act of bank fraud occurring on June 30, 2015, when he took an *unauthorized* advance of $22,800 from an *existing* PrimeSouth loan issued to the ECEDA and applied the proceeds of that advance as payments on two unrelated loans that were past due. (Information (Doc. # 1); Plea Agreement, at 6; PSR ¶ 7.) There is a vast factual difference in manipulating the internal books and operations of the Bank — the charged conduct

14

— and initiating and consummating new loans to a new business entity.  The Government has not proven a common victim, common accomplice, common purpose, or similar modus operandi connecting the charged conduct and the uncharged conduct.

PrimeSouth undisputedly was the victim of Mr. Monk's unauthorized ECEDA advance; however, the Government did not prove by a preponderance that PrimeSouth was the victim of the transactions concerning the Real Island Investments loans.  Mr. Monk, who did not have loan authority to approve the new loans to Real Island Investments, presented unrefuted evidence that, unlike the unauthorized ECEDA advance, the Real Island Investments loans had the express approval of PrimeSouth's officials who knew both that the loans would not be paid back and that the purpose of the loans was to pay off the 2008 Fuller non-performing loans.  The Real Island Investments loans and their purposes were sanctioned by PrimeSouth, unlike the unauthorized ECEDA advance.

Additionally, the facts are that Mr. Monk acted alone in his charged conduct, and he owned up to it; hence, the charged conduct and the uncharged conduct do not share a common accomplice.  Furthermore, the Government did not present evidence that the charged and uncharged conduct had a common purpose.  The evidence established that the purpose of the transactions concerning the Real Island Investments loans was to conceal losses affecting the health of PrimeSouth Bank's

continuing obligations arising from the MOU.  But there was no evidence of a similar purpose as to the charged conduct.  Finally, the modus operandi of the two schemes differed in a material respect:   PrimeSouth itself authorized one scheme (the uncharged conduct) but did not authorize the other scheme (the charged conduct).

Finally, the Government failed to prove that Mr. Monk's involvement in the transactions relating to the 2013 Real Island Investments loans was criminal.  The Government has not pointed to a criminal statute that Mr. Monk violated, and it has not proven that his involvement in the Real Island Investments transactions was bank fraud under § 1344(2).  The Government did not prove (by a preponderance of the evidence) that Mr. Monk acted to induce the Bank (or custodian of bank property) to part with money in its control.  The Bank itself made the decision to make the new loans to pay off the old for reasons other than a misrepresentation by Mr. Monk. *See Loughrin*, 573 U.S. at 362–63.

The Government presented no evidence that, for his involvement, Mr. Monk concealed or intended to conceal the nature and purpose of the Real Island Investments loans from those individuals with full and final authority to authorize the loans (*i.e.*, the CEO and senior lender).  It was no secret that the loans were unsecured and that Mr. Fuller, the same individual who was unable to pay back the 2008 loans, also was — at the same time, *i.e.*, contemporaneously — personally guaranteeing the Real Island Investments loans.  Mr. Fuller's signature and printed

name are on the promissory notes.  Someone in the Bank, besides and above Mr. Monk, approved this banking charade.

The court credits Mr. Monk's testimony that the then-CEO of PrimeSouth and/or the senior lender approved the Real Island Investments loans and that no higher approval was required.  The court also credits Mr. Monk's testimony that the CEO and/or senior lender knew that the 2008 Fuller loans were to be paid off through the loans to Real Island Investments to delay and conceal PrimeSouth's losses on the non-performing 2008 Fuller loans and that the Real Island Investments loans would later be charged off as non-performing.[10]  The CEO's and senior lender's knowledge is explainable as a matter of common sense.  Why would the CEO or senior lender approve the loans on Mr. Fuller's personal guarantees, guarantees they knew were not worth the paper they were written on, if they did not know that the proceeds would be routed back to PrimeSouth to pay off the defaulting Fuller loans?  (*See* Tr. at 112 (court's discussion of the elephant in the room).)  In short, and on the record evidence, the court finds that PrimeSouth, through officers with final decision-making authority on the loans in question, authorized the loans to Real Island Investments, LLC, for the purposes for which the loans were used.

_____

[10] Mr. Fuller closed more than fifty real estate transactions per month as an attorney and indisputably knew the 2008 loans to him personally were bad.  The FBI agent's testimony that Mr. Fuller did not know the purpose of the 2013 transactions is not credited; it is rejected.

The Government presented no contrary evidence as to Mr. Monk's part in the 2013 transactions involving the Real Island Investments loans.   During its investigation, its agents did not question either the CEO or the senior lender about the Real Island Investments loans.   In fact, the record reflects that no attempt at all was made to talk to the senior lender.   To the extent that the Government argues that Mr. Monk misled the FDIC by covering up losses, that argument is a non-starter: § 1344(2) criminalizes the defrauding of a federally insured financial institution, not the FDIC.   *See Martin*, 803 F.3d at 588.

The Government also cited no caselaw with similar facts or legal issues in its sentencing memorandum or at the hearing.   While Mr. Monk's uncharged conduct may have been unethical and scandalous, even slick, the Government has not shown a basis for finding that his uncharged conduct was unlawful.   Accordingly, the Government has not proven by a preponderance of the evidence that Mr. Monk's involvement in the transactions concerning the payoffs of the 2008 non-performing Fuller loans with proceeds of the Real Island Investments loans and the subsequent charge off of the Real Island Investments loans is relevant conduct within the meaning of § 1B1.3, for purposes of calculating PrimeSouth's loss.

**2.     § 2B1.1 Loss**

Even if it is assumed *arguendo* that the uncharged conduct surrounding the Real Island Investments loans was relevant conduct, the Government still could not

18

prove an actual loss. For certain crimes, including bank fraud, the Sentencing Guidelines require an increased offense level based on the amount of loss suffered. *See* § 2B1.1(b)(1). Loss is calculated as "the greater of actual loss or intended loss." § 2B1.1 cmt. n.3(A). "Actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at cmt. n. 3(A)(i). "[R]easonably foreseeable pecuniary harm" is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." § 2B1.1 cmt. n.3(A)(iv).

"If the defendant returned any money or property to the victim or rendered any services before the offense was detected, the loss amount is reduced by the fair market value of the money returned or the services rendered." *United States v. Worley*, 729 F. App'x 850, 851 (11th Cir. 2018) (citing § 2B1.1 cmt. n.3(E)(i)). "Actual loss" thus incorporates a "net loss approach." "This 'net loss approach' reflects the Sentencing Commission's position that an offender who transfers something of value to the victim is generally committing a less serious offense than one who does not." *Id.* (citing *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014)). Application note 3 to § 2B1.1(b), thus, approves "Credits Against Loss": "Loss shall be reduced . . . [i]n a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not

19

been disposed of by that time, the fair market value of the collateral at the time of sentencing."[11]  § 2B1.1 cmt. n.3(E)(ii).  Hence, loss equals actual loss (or intended loss) minus credits against loss.

"Intended loss" is the "pecuniary harm that the defendant purposely sought to inflict."  *Id.* at cmt. n. 3(A)(ii); *see also United States v. Usman*, 460 F. App'x 414, 417 (5th Cir. 2012) ("Intended loss" requires proof that the "defendant had the subjective intent to cause that amount of loss.").

"Fraud has many manifestations, and calculating the loss associated with a particular scheme is sometimes more art than science."  *United States v. Alphas*, 785 F.3d 775, 781 (1st Cir. 2015).  For this reason, the Sentencing Guidelines do not require a precise determination of loss.  *Id.*  Instead, "[a] sentencing court need only make a reasonable estimate of the loss, given the available information."  *United States v. Orton*, 73 F.3d 331, 335 (11th Cir. 1996).

The PSR includes in its actual loss calculation the full amounts of the two Real Island Investments loans that defaulted ($188,518.75 and $64,569.52 for a total of $253,088.27).  The Government does not argue that Mr. Monk intended to cause PrimeSouth a loss through his involvement securing the two Real Island Investments

---

[11] *See generally Stinson v. United States*, 508 U.S. 36, 38 (1993) (holding "that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

Loans, LLC, and the PSR does not classify the loss as intended.  (*See* PSR ¶¶ 15–16.)  To the contrary, there is evidence that Mr. Monk intended to benefit PrimeSouth by using the loan proceeds to delay the reporting of the 2008 Fuller loan losses in the hopes that the delay would buy PrimeSouth time to increase its assets to cover its losses.  In any event, the Government presented no evidence of intended loss.  Hence, only actual loss is at issue.

The PSR categorizes the two loans made to Real Island Investments, totaling $253,088.27 as "actual loss suffered by" PrimeSouth Bank.  (PSR, at 6.)  The Government's sentencing memorandum backs the PSR's recommendation arguing that there was an actual loss because Real Island Investments "never paid back" the loan amounts and PrimeSouth "wrote off the full amount" of the loans.  (Doc. # 27, at 5.)

Mr. Monk does not dispute that the 2013 loans to Real Island Investments were not repaid and ultimately were charged off.  Mr. Monk disputes, though, that charging off the Real Island Investments loans created an actual loss to PrimeSouth.

The Government has not proven an actual loss by a preponderance of the evidence for two reasons.  First, the two loans in 2013 to Real Island Investments did not result in an actual loss to PrimeSouth because the loss already had occurred.  The court credits Mr. Monk's testimony — unrefuted — that at least by December 2010, PrimeSouth had determined that the 2008 Fuller loans were uncollectible and

21

had decided to charge off the 2008 Fuller loans over a period of several years.  (Tr. at 96–97.)  As noted earlier, the Government has not contended that Mr. Monk acted with fraudulent pretenses in authorizing the two loans for Mr. Fuller in 2008.  Nor did the Government present evidence that the 2008 Fuller loans, although ultimately deemed uncollectible by PrimeSouth, were unlawful at their origination or at their demise.  (*See, e.g.*, Tr. at 29 ("There's no contention but that the initial Fuller loans were legal.").)  The loss to PrimeSouth flowed from the legitimate 2008 Fuller loans, and not from any fraudulent activities by Mr. Monk.

To be sure, PrimeSouth loaned $253,088.27 to Real Island Investments, a straw company that PrimeSouth and Mr. Monk knew had neither the intention nor the ability to repay the loans.  But that is a different issue from whether Mr. Monk's conduct in securing the two Real Island Investments loans caused PrimeSouth to suffer an actual loss of $253,088.27.  The two loans to Real Island Investments neither increased nor decreased PrimeSouth's losses flowing from the 2008 defaulted, but legitimate, Fuller loans.  All of the loan proceeds from the two Real Island Investments loans were paid back to PrimeSouth to wipe out the 2008 Fuller loans.

The losses realized on the Real Island Investments loans admittedly did not put PrimeSouth in a better position monetarily but it also did not put PrimeSouth in a worse position.  If there is another theory for measuring the pecuniary harm to

PrimeSouth for purposes of calculating actual loss, the Government has not argued it or presented evidence of it.  The actual losses resulted from the valid 2008 Fuller loans, and not from Mr. Monk's activities in procuring the 2013 Real Island Investments loans.

Alternatively, even if it is assumed that PrimeSouth suffered an actual loss of $253,088.27 on the defaulted Real Island Investments loans, the court would next consider whether PrimeSouth received something of monetary value even amidst Mr. Monk's fraudulent activities.  For example, in mortgage-fraud cases, the "actual loss" is offset by the value of the collateral on the loan.  *See United States v. Howard*, 784 F.3d 745, 748 (10th Cir. 2015).  Here, there was no collateral pledged on the Real Island Investments loans as the loans were unsecured.  But PrimeSouth was the beneficiary of the loan proceeds on the Real Island Investments loans.  Within a two-day turnaround, PrimeSouth loaned Real Island Investments $253,088.27, and Real Island Investments gave the money back to PrimeSouth as payments on the balances owed to PrimeSouth on Mr. Fuller's 2008 delinquent loans.  PrimeSouth received something of value through the loans because all of the loan proceeds were paid back to PrimeSouth Bank.

Although not comparable on all fours, *United States v. Markert*, 732 F.3d 920 (8th Cir. 2013), lends support to the theory that PrimeSouth received a creditable monetary benefit from the loans to Real Island Investments.  There, the defendant, a

23

bank president, was convicted for willful misapplication of bank funds under 18 U.S.C. § 656. The bank president had approved five nominee loans to friends and family of a bank customer, and the proceeds of those bank loans were used to cover a $1.9 million overdraft in one of the customer's checking accounts. At sentencing, for purposes of determining actual loss, the government argued, and the district court found, that the bank's actual loss was $1.9 million. *See id.* at 923–25. The Eighth Circuit reversed. Although it did not decide what the bank's actual loss was, it held that the district court's ruling failed to credit against the actual loss the "monetary value of the nominee loans the Bank received in exchange for the misapplied proceeds, measured at the time the misapplication offense was detected." *Id.* at 932.

Here, similarly, while Real Island Investments defaulted on the loans, PrimeSouth benefitted from the loans because the proceeds were channeled back to the Bank almost instantly. The actual loss is appropriately reduced by the amount PrimeSouth obtained from the loan proceeds in the form of a credit. As the Eighth Circuit recognized, "§ 2B1.1 adopted a net loss approach, which recognizes 'that the offender who transfers something of value to the victim generally is committing a less serious offense than an offender who does not.'" *Markert*, 732 F.3d at 932 (quoting U.S.S.G. App. C, Vol. II, Amend. 617, at 183 (2003)).

Accordingly, the Government has not proven by a preponderance of the evidence that PrimeSouth suffered an actual loss or a net loss of $253,088.27 as a

result of the defaulted Real Island Investments loans.  Mr. Monk's objections, therefore, are sustained.

**B.**    **Restitution**

"Proving actual loss for restitution purposes is largely the same as proving actual loss for Guidelines' loss calculation purposes."  *United States v. Cavallo*, 790 F.3d 1202, 1239 (11th Cir. 2015). Because the Government has not proved by a preponderance of the evidence that PrimeSouth suffered an actual loss on the Real Island Investment loans, those loans totaling $253,088.27 will not be included in the restitution order for the reasons stated above.

Furthermore, at the resumed hearing on July 29, 2020, the parties resolved the remaining objections to the restitution amount.  Mr. Monk's restitution obligation is $184,195.45.

**C.    The Relevance of the MOU**

At the hearing on July 29, 2020, the Government objected to the relevance of the MOU.  The Government argued essentially that the MOU means nothing today and that it meant nothing in 2009 and 2010.  It is true that it was not a binding contract.  But the MOU is fertile evidence — a written admission by PrimeSouth — of the condition of the Bank at the conclusion of the 2009 audit.  It explains why the Bank management at the highest levels would be motivated to find ways to extend loans — particularly loans like the two of Mr. Fuller's that were problematic, in

excess of $250,000 combined (clearly a benchmark for the auditors), and most importantly, were not identified by the auditors in the random selection of loan files examined in 2009.  (See list of loans identified by auditors, etc.).  The Bank already knew by 2010 that the Fuller loans were dead; they just had not been buried yet.  (*See* Def.'s Ex. 5.)

The Bank itself established the relevance of the MOU by signing it.   It admitted that the financial condition of the Bank had deteriorated (which is not a surprise given the 2008–09 economic downturn); that serious issues existed on the management side of operations, particularly in the loan department; and that loan documentation was poor, especially in the $250,000 and higher range.  The MOU was the product of significant deficiencies identified in the 2009 joint audit by state and federal banking supervisory regulators.  It was a wake-up call to management: Get your act together or else.

Not only is the MOU relevant to explain motive, it became a roadmap for the Bank to successfully navigate choppy economic waters and, to its credit, survive a massive economic storm, the eye of which rested primarily in the banking and financial industries.  The Bank's responses to the 2009 audit that resulted in the MOU, and the findings of improvement in the 2010 audit, confirm that management had made structural changes pleasing to the regulators, changes that long survived the "termination" of the MOU.   These included a promise to prepare annual

operating and profit goals and projections, and remove lending authority of Mr. Monk and CEO Baggett, both noted on a positive note by the 2010 audit.

Finally, the MOU and 2010 audit confirm permanent changes in personnel duty assignments and operational improvement, especially in the loan department. Taken together, the two audits explain Mr. Monk's predicament vis-à-vis his loan portfolio, provide a snapshot of audit results and bank improvements, and provide background for the underlying offense and the guidelines issues.

Finally, though the parties initially referred to it as a "cease and desist order," the items addressed in the MOU are consistent with Mr. Monk's testimony regarding the regulatory environment and intervention in 2009 and 2010.  This consistency bolsters the credibility of  Mr. Monk's testimony.

In conclusion, the MOU was a warning ticket.  While it was not technically a binding contract, it was a large-caliber shot across the bow of the Bank.

## III.  ORDER

Thus, it was ORDERED that Mr. Monk's objections to the loss amount under § 2B1.1(b) and for restitution were SUSTAINED as to the loans to Real Island Investments, LLC, in the amount of $253,088.27.  (Doc. # 34.)

To the extent the PSR conflicts with this Opinion, it is AMENDED to conform to the findings herein.

It is further ORDERED that Mr. Monk must pay $184,195.45 in restitution to PrimeSouth Bank's successor, as will be set out in the judgment.

DONE this 1st day of September, 2020.

_____ /s/ W. Keith Watkins _____
UNITED STATES DISTRICT JUDGE